Walter G. Coppenrath, Jr. (SBN 81691)
Philip S. Dalton (SBN 65576)
George M. Jones (SBN 160227)
COPPENRATH & ASSOCIATES LLP
400 Oceangate, Suite 700
Long Beach, California 90802
Telephone: (562) 216-2948
Facsimile: (562) 252-1136
Attorneys for Specially Appearing Claimant and Defendant
JUANITA GROUP LIMITED and Defendant M/Y BIRGITTA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAPITAL BANK PLC. (a subsidiary of Bank of Scotland),<br><br>Plaintiff,<br><br>vs.<br><br>M/Y BIRGITTA, Official No: 910659, and her engines, tackle and apparel etc., in rem; and JUANITA GROUP LIMITED, in personam,<br><br>Defendants. | Case No. 2:08-cv-05893-PSG (SSx)<br><br>**M/Y BIRGITTA'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: July 12, 2010<br>TIME: 1:30<br>ROOM: 880/Roybal<br><br>Assigned to: The Hon. Philip S. Gutierrez<br>Trial Date: July 13, 2010 |

# Table of Contents

I. INTRODUCTION ..........................................................................................................1

II. CAPITAL BANK FAILED TO GIVE JUANITA CONTRACTUALLY MANDATED NOTICE AND OPPORTUNITY TO CURE THEREBY PRECLUDING SUMMARY JUDGMENT ON ALL NON-MONETARY ALLEGED DEFAULTS ..........................................................................................2

III. THERE ARE SUBSTANTIAL DISPUTED FACTUAL ISSUES WITH REGARD TO EACH OF THE ALLEGED DEFAULTS ..........................................4

    A. THERE WAS NO PAYMENT DEFAULT BEFORE THE BIRGITTA WAS ARRESTED, IN THAT ALL PAYMENTS WERE MADE CONSISTENT WITH THE PARTIES' COURSE OF DEALINGS AFTER CAPITAL BANK DECLARED THE MANDATED DIRECT DEBIT PAYMENT SYSTEM UNWORKABLE ..........................................................4

    B. THERE WAS NO PRE-ARREST INSURANCE COVERAGE DEFAULT AND CAPITAL BANK'S CLAIM TO THE CONTRARY IS DISINGENUOUS – CAPITAL BANK KNOWS THAT THE BIRGITTA WAS FULLY INSURED FOR US WATERS ..........................................................6

    C. THERE WAS NO DEFAULT CAUSED BY THE BIRGITTA BEING IN US WATERS BECAUSE THERE WAS NO PRIOR WRITTEN CONSENT REQUIREMENT ..........................................................................................9

IV. UNDER THE DOCTRINE OF UNCLEAN HANDS, NO ALLEGED POST-ARREST DEFAULT IS ACTIONABLE, INCLUDING THE CHANGE OF OWNERSHIP OF JUANITA ..........................................................................13

# Table of Authority

*Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir., 1985) ............... 13, 14

## I. INTRODUCTION

By now, this Court is well familiar with this case and the parties. This is a creditor - debtor dispute made complex by the interplay of maritime law and English law giving rise to jurisdictional issues and less than complete clarity about the Parties' respective rights and obligations. Putting aside whatever advocate's spin each side places on the facts, the reality is that relatively few, although key, facts are in contention. Those disputed facts are nevertheless highly material, and go to the heart of CAPITAL BANK's allegations of default under the subject ship mortgage. Their existence necessarily precludes summary judgment.

What really happened here is that CAPITAL BANK became uneasy about certain *other* loans it had made to JUANITA's then-director Carl Freer, and seized upon the BIRGITTA mortgage as a means to alleviate those concerns. CAPITAL BANK has been attempting to justify that (literal) seizure ever since, by invoking (or inventing) a panoply of *ex post facto* "defaults".

With regard to all alleged defaults other than the payment default, the Marine Loan (Exhibit 1)[1] mandates notice and a 30-day right to cure for all non-monetary breaches. CAPITAL has presented no evidence of having given such notice and in fact, one of its corporate deponents admitted no such notice was given. The failure of this contractual condition precedent by itself is sufficient to deny the instant motion to the extent it is based allegations of non-monetary defaults

In addition, the Court should disregard in its entirety CAPITAL BANK's expert's "report", which contains factual interpretations, obvious partisan efforts to resolve contract ambiguities into absurdities and conclusions of law. The document is not subscribed under oath, lacks any foundational showing to qualify the expert to render the opinions he does, and addresses issues the Court, rather than an expert witness, must resolve. On that basis, BIRGITTA objects to the Craig Opinion.

---

[1] All Exhibits referenced herein are to those attached to the concurrently filed Coppenrath Declaration and incorporated herein by this reference.

Finally, BIRGITTA continues to contend that this Court lacks subject matter jurisdiction because CAPITAL BANK does not have a preferred ship mortgage. However, having already lost its jurisdictional challenge in motion practice, BIRGITTA will not renew it here while reserving its post trial appellate rights.

## I. CAPITAL BANK FAILED TO GIVE JUANITA CONTRACTUALLY MANDATED NOTICE AND OPPORTUNITY TO CURE THEREBY PRECLUDING SUMMARY JUDGMENT ON ALL NON-MONETARY ALLEGED DEFAULTS

Paragraph 9.1(iii) entitled "Events of Default" of the Marine Loan (Exhibit 1, page 5) provides the following with regard to any default other than the obligation to repay the loan:

> "[If] you fail duly to perform or comply with any other obligation expressed to be assumed by you in this Agreement and such failure is not remedied within thirty days after we have given notice to you;"

Paragraph 9.1(viii) of the Marine Loan (Exhibit 1, page 6) incorporates all of the obligations under the Marine Mortgage (Exhibit 3) and makes a default under any of those obligations a event of default under the Marine Loan:

> "[If] you fail to observe or to perform any of her obligations under the Marine Mortgage or any other document executed in accordance with it;"

In its Motion for Summary Judgment CAPITAL BANK alleges non-monetary defaults of obligations arising regarding

- insurance (Exhibit 3, ¶8);
- taking the Birgitta out of UK territorial waters without consent (Exhibit 3, ¶11(b); and,
- Changing the ownership of JUANITA after the arrest (Exhibit 3, ¶4(xii))

Yet CAPITAL BANK has not provided evidence in its motion to show that it complied with the Marine Loan requirement that JUANITA be given notice and an opportunity to cure such defaults; it admitted in deposition testimony that it did not:

> Q. In paragraph 9, Events of Default, in subparagraph 9.1, in paren (iii), close paren:
> "You fail duly to perform or comply with any other obligation expressed to be assumed by you in this Agreement and such failure is not remedied within thirty days after we have given notice to you."
> Do you see that?
> A. Yes.
> Q. Does the bank have any record of ever having given Juanita any notice in writing pursuant to this subparagraph that I just read?
> A. No.

Deposition of Peter Whitehead Vol. 1, 71:12-24; [AMF 94][2]

CAPITAL BANK's unqualified admission of not having satisfied a core condition precedent to a non-monetary default should eliminate consideration of those defaults in ruling on the instant motion.

No doubt, CAPITAL BANK will cite the Marine Mortgage (Exhibit 3, ¶4) which provides for immediate debt acceleration upon default of any obligation without need for "formal demand" to contest the need for notice and cure upon any non-monetary default. However, when it does, it will unavoidably be calling the Court's attention to a glaring conflict (i.e., ambiguity) CAPITAL BANK created in its loan documents and BIRGITTA contends that ambiguity must be resolved in BIRGITTA's favor.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

---

[2] The term "AMF" used herein refers to an "Additional Material Fact" as set out in BIRGITTA's "Separate Statement of Genuine Issues in Opposition to Motion for Summary Judgment; Additional Material Facts" filed concurrently.

II. **THERE ARE SUBSTANTIAL DISPUTED FACTUAL ISSUES WITH REGARD TO EACH OF THE ALLEGED DEFAULTS**

A. **THERE WAS NO PAYMENT DEFAULT BEFORE THE BIRGITTA WAS ARRESTED, IN THAT ALL PAYMENTS WERE MADE CONSISTENT WITH THE PARTIES' COURSE OF DEALINGS AFTER CAPITAL BANK DECLARED THE MANDATED DIRECT DEBIT PAYMENT SYSTEM UNWORKABLE**

CAPITAL BANK failed to disclose in its moving papers numerous essential facts related to the alleged payment default, and has misstated the payment-related facts it does cite. The actual deposition testimony and documentary evidence related to the payment issue can be fairly summarized as follows:

1. Had CAPITAL BANK implemented the Direct Debit payment system mandated in the loan documents there would have been an automatic timely payment of each monthly mortgage payment thereby eliminating the possibility of any payment default. [AMF 28]

2. The Direct Debit payment system was so important to JUANITA that it would not have borrowed the funds without it. [AMF 30]

3. The Direct Debit payment system was so important to CAPITAL BANK that its loan documents mandated that all payments had to be by direct debit, and a failure to pay by direct debit would be an event of default. [AMF 30 and 31]

4. Before the loan transaction was completed, key CAPITAL BANK employees involved in the transaction knew or suspected that the Direct Debit payment system could not possibly be implemented for the JUANITA loan, but did not disclose that fact to JUANITA. [AMF 35]

5. More than three months after funding the loan, CAPITAL BANK finally told JUANITA the truth about the impossibility of using the Direct Debit system. [AMF 38 and 39]

6. CAPITAL BANK's alleged Undisputed Fact 16 is false in its claim that the parties agreed to a "standing order" process to replace the Direct Debit system. In fact, after telling JUANITA the truth about the Direct Debit system's unavailability, the parties never modified the loan documents to provide for another method of payment. [AMF 42 and 43]

7. After the Direct Debit system disclosure, CAPITAL BANK sent out manually prepared monthly invoices. However, these were: (a) consistently sent to the wrong address; and, (b) never transmitted on a consistent schedule. JUANITA, on the other hand, consistently *paid* each of those invoices within thirty days of receipt. [AMF 48 and 49]

8. CAPITAL BANK has no proof of when any particular monthly invoice was sent other than the April 2006 invoice that was sent on April 12, 2006,[3] and the August, September and October 2005 invoices that were all sent at the same time after CAPITAL BANK disclosed the direct debit problem. [AMF 51]

9. CAPITAL BANK has no proof of the actual date it received any particular monthly payment except for the April and May 2006 payments that it received on the same date in April 2006. [AMF 52]

10. This mortgage payment course of dealings – payment within 30 days of invoice receipt – was utilized by the parties in lieu of the abandoned Direct Debit system, and continued up to the time of arrest. In all that time, CAPITAL BANK never made any internal notation of a default or late payment and never notified JUANITA that any payment was late or that any default had occurred. [AMF 53, 54 and 55]

---

[3] This fact alone demonstrates - contrary to CAPITAL BANK's present assertion - that any payment "deadline" by the 9th of any given month survived the demise of the Direct Debit system. How could an invoice sent April 12 possibly be "due" on April 9?

English law recognizes the implication of contractual terms through an established course of dealing.[4] JUANITA contends that the above facts establish just such a course of dealings between the parties that absolutely precludes any finding of a payment default. CAPITAL BANK's own UK attorney who prepared the loan documents admitted as much. [AMF 47]

While JUANITA contends the above-referenced evidence clearly and completely refutes CAPITAL BANK's allegation of default in pre-arrest payments, at a minimum it is unquestionably sufficient to raise a triable issue of fact on that issue.

### B. THERE WAS NO PRE-ARREST INSURANCE COVERAGE DEFAULT AND CAPITAL BANK'S CLAIM TO THE CONTRARY IS DISINGENUOUS – CAPITAL BANK KNOWS THAT THE BIRGITTA WAS FULLY INSURED FOR US WATERS

The evidence establishes beyond good faith dispute that the BIRGITTA was always insured to be in US waters from July 2005 through the time it was arrested in May 2006. [AMF 65, 66, 67, 68, 69 and 70] CAPITAL BANK had documentary proof of this fact as early as April 2005 – before the original arrest of the BIRGITTA - and without a doubt within a week of the arrest. [AMF 70 and 71] It is simply inexcusable, and a monumental waste of this Court's time, for CAPITAL BANK to continue to promote the myth of non-coverage. There are many legitimately disputed issues in this case, but insurance coverage is surely not one of them.

---

[4] See excerpt from Halsbury's Laws of England, 4th Ed., Vol. 9(1), "Contract", Para. 780, page 527 ("Even where it is not possible to show a local custom or usage that might be imported into a contract of the particular type before the court, it may be possible to import the term on the basis of the previous course of dealings between the parties...") A true and correct copy of said excerpt is attached to the accompanying Declaration of Walter G. Coppenrath as Exhibit K.

      The 2005-2006 Hull and the Protection and Indemnity policies clearly establish such coverage for that policy year. The BIRGITTA was in US waters from approximately August 2006.

      For policy year April 2006-March 2007, the BIRGITTA was likewise fully insured for US waters. [AMF 70] CAPITAL BANK, however, ignoring what it knows to be the truth about insurance coverage, argues that the first iteration of the 2006-2007 Hull Policy (Exhibit 248-a document which contains an obvious scrivener's error with regard to US waters coverage) is in fact the actual Hull Policy in effect for 2006-2007. That is not true, and at least since a week after the May 2006 arrest, CAPITAL BANK has known that in fact proper coverage was at all times in place for the 2006-2007 policy year. [AMF 70 and 71]

      The facts establishing that there was always full coverage for US waters also expose CAPITAL BANK's disingenuous allegation to the contrary:

1. When asked by CAPITAL BANK in April 2006 to provide it with copies of the insurance policies, JUANITA did so. [Exhibits 100 & 109]
2. The 2006-2007 Protection and Indemnity policy clearly showed coverage for US waters. [Exhibit 197, page 9]
3. However, the copy of the 2006-2007 Hull policy originally provided to CAPITAL BANK, because of an insurance broker error (Exhibit248), had and older version of the first page of the hull policy – a version that existed in April 2005 which limited hull coverage for US waters to 14 days. That 2005 limited coverage was in place when JUANITA purchased the BIRGITTA in 2005, but when it shipped the BIRGITTA to the US in the summer of 2005, the Hull policy was amended to include full coverage for US waters. [AMF 63, 65, 66 and 67]
4. Before the May 2006 arrest of the BIRGITTA, JUANITA confirmed in writing the existence of full US waters coverage for the Protection and Indemnity Policy. [AMF 69]

5. By May 11, 2006, less than a week after the arrest of the BIRGITTA, JUANITA provided proof of full Hull and Protection and Indemnity coverage for US waters. [AMF 70]

6. CAPITAL BANK had the right under the loan documents to clarify any confusion it had about insurance coverage, but purposefully chose not to do so before arresting the BIRGITTA. [AMF 73]

7. CAPITAL BANK was also informed by JUANITA's insurance broker in 2007 that there was full US waters coverage for the BIRGITTA for the 2006-2007 policy year. [AMF 74]

- Thus the evidence cited above establishes that before the BIRGITTA was arrested in May of 2006 CAPITAL BANK knew (or at least should have known, and could easily have found out by directly contacting JUANITA's insurance broker) that there was full coverage for US waters. [AMF 72 and 73]
- Within a week after arresting the BIRGITTA in May 2006, the Bank absolutely knew that there was full US waters coverage. [AMF 70]
- In June 2007, CAPITAL BANK confirmed once again that there was full US waters coverage at the time of the arrest. [AMF 74]

Yet despite of this clear and admitted knowledge that it has had for as much as four years, CAPITAL BANK repeated the bogus insurance coverage allegation when it filed its Complaint in September 2008, again when it filed the First Amended Complaint (Document 23, paragraph 10(b)) in April 2009, and yet again in the current motion (Document 128, page 9, lines 2-11). Surely, this is taking the notion of spirited advocacy well beyond any reasonable bounds. There has always been proper insurance for US waters from July 2005 until after the May 2006 arrest. CAPITAL BANK knows this is true.

While JUANITA again contends the above-referenced evidence clearly and completely refutes CAPITAL BANK's allegations of default in providing insurance

coverage, at a minimum it is unquestionably sufficient to raise a triable issue of fact on that issue.

### C. THERE WAS NO DEFAULT CAUSED BY THE BIRGITTA BEING IN US WATERS BECAUSE THERE WAS NO PRIOR WRITTEN CONSENT REQUIREMENT

In its moving papers, CAPITAL BANK asserts, "Juanita's act of shipping the vessel to the United States without prior written consent from the Bank resulted in a default under the Marine Loan Agreement and Marine Mortgage...." (Notice of Motion, Document 128, page 9, lines 12-14) The facts and documents are at odds with this contention because prior *written* consent to go beyond the "territorial waters of the United Kingdom" was not required by the loan documents. Further, CAPITAL BANK gave such consent at the time it executed the Marine Mortgage on July 6, 2005. Finally, if that were not enough, CAPITAL BANK again effectively consented to the BIRGITTA being in US waters in an email to JUANITA in April 2006.

Paragraph 11(b) of the Marine Mortgage (Exhibits 3 and 3A) provides:

"You hereby further covenant with us as follows:
(b) not to use the Vessel except as hereinafter permitted in pursuance of a trade, but only for your private use within the territorial waters of the United Kingdom except in so far as we have, provided our prior written consent to the Vessel being chartered via a charter company approved by us or, consented to you taking the Vessel outside the territorial waters or the United Kingdom;"

Paragraph 11(b) requires *written* consent only if the BIRGITTA was going to be chartered by a charter company. CAPITAL BANK itself concedes that *written* consent was not required to take the BIRGITTA out of UK waters in paragraph 10(b) of the Verified First Amended Complaint (Document 23), where it alleges a default based on lack of "consent", not *written* consent. CAPITAL BANK's own attorney, Russell Kelly, who prepared the loan documents, agrees with this interpretation; namely, that paragraph 11(b) allows consent of any kind, and does

not mandate *written* consent, for the BIRGITTA to be outside of UK territorial waters. [AMF 82]

> Q.   BY MR. COPPENRATH: Looking again at Article 11(b), the reference to "prior written consent" is initially in the context of vessel chartering; correct?
> A.   Yes.
> Q.   Then when taking the vessel outside of the territorial waters the word "consented" is used but there's no repeat of the word "written." Was that on purpose?
> A.   I assume so.
> Q.   And why was that?
> A.   I don't recall.
> Q.   Would you agree with me that a fair interpretation of this 11(b) under English law and practice is that the consent required to take the vessel outside the territorial waters of the United Kingdom is any type of communicated consent, not just written consent?
> A.   Yes.

Kelly, Vol. 2, 161:22 to 162:15

Thus CAPITAL BANK seeks summary judgment, in part, based on a non-existent mortgage obligation (obtaining written consent to go beyond UK territorial waters). This infirmity alone should be sufficient for the Court to reject the lack-of-written-consent portion of Plaintiff's motion.

However, there are other compelling grounds that likewise defeat Plaintiff's contention that there was a mortgage default because JUANITA did not obtain CAPITAL BANK's consent before it shipped the BIRGITTA to the US in July 2005. When CAPITAL BANK executed the Marine Mortgage (Exhibit 3) on July 6, 2005, its authorized employee was instructed to, and did, add in handwriting the word "Europe" after the preprinted words "Vessel will be kept at kept at:" on page 2 of the Marine Mortgage thus creating the phrase "Vessel will be kept at Europe." [Stipulated Fact 27 and AMF 77] BIRGITTA contends that this change effectively eliminated the UK waters/consent requirement.

There is no requirement in the Marine Mortgage that CAPITAL BANK's

consent to take the vessel out of "UK territorial waters" arose each time the BIRGITTA wanted to do so. Indeed, CAPITAL BANK admits that it knew before the loan transaction closed that JUANITA intended to use the BIRGITTA outside of UK territorial waters [AMF 75] and that it did not expect JUANITA to obtain its consent before doing so. [AMF 76] Furthermore, none of the loan documents prohibited JUANITA from operating the BIRGITTA in U.S. waters [AMF 79] and CAPITAL BANK had no policy of prohibiting vessels on which it held a mortgage from operating in US waters. [AMF 80] CAPITAL BANK even acknowledges that its lending and underwriting standards applicable to all super yachts such as the BIRGITTA allow them to operate outside of UK territorial waters. [AMF 81]

The addition of the word "Europe" to the Marine Mortgage is extremely significant, and is either conclusive evidence that CAPITAL BANK knew of, and consented to, the BIRGITTA's removal from "UK territorial waters" at the very inception of the mortgage transaction or, at the very least, is a Plaintiff- created ambiguity that under the English law of contractual interpretation must be interpreted against CAPITAL BANK. CAPITAL BANK's own English lawyer fully supports this view of English law:

> Q. English law and practice also encompasses the contractual interpretation principle of interpreting ambiguities against the party who creates them; correct?
> A. *Contra proferentum*, yes, I believe.
> Q. And then that is a principle well embedded in English law and practice, isn't it?
> A. It is.

Kelly Deposition, Vol. 2 161:6-12; [AMF 91]

CAPITAL BANK's contract law "expert", Nicholas Craig, opines (neither under oath nor with submitted qualifications) in paragraph 24 of his opinion (Document 128-5, Plaintiff's Exhibit 5, pages 8 and 9) that the handwritten word "Europe" can "happily exist 'side by side'" with paragraph 11(b) UK waters restriction because the United Kingdom is in Europe. That facile conclusion

ignores the BANK-created ambiguity and utterly fails to address the question why CAPITAL BANK instructed its employee who signed the Marine Mortgage to insert the handwritten word "EUROPE". Mr. Craig apparently believes that CAPITAL BANK added the word "Europe" for no, or no significant, reason and evidences no CAPITAL BANK intent whatsoever. Yet, resolving this ambiguity is the role of the trier of fact, not Mr. Craig, even if he were qualified to so opine, and was willing to do so under oath. Resolving the ambiguity created by the insertion of the word "Europe" by applying the *contra proferentem* interpretation principle in a manner favorable to BIRGITTA should result in a finding that CAPITAL BANK waived any right to invoke paragraph 11(b) of the Marine Mortgage.

    Furthermore, in April 2006, a month before the initial arrest of the BIRGITTA, when CAPITAL BANK admits it was aware the BIRGITTA was in the US, CAPITAL BANK did not protest the vessel's location. (Exhibit 112 — 3 emails dated April 27, 2006). Rather, (and consistent with BIRGITTA's suggested interpretation of the effect of the word "Europe") without criticism, invocation of the consent requirement of paragraph 11(b), or declaration of default, CAPITAL BANK wrote to JUANITA and simply asked in an April 27, 2006 email (part of Exhibit 112) for "Confirmation" that proper insurance was in place and that the insurance noted "the vessel currently remains in US waters." [AMF 88 and 89] One could construe the quoted email standing alone as consent to the BIRGITTA being in US waters. However, when that April 27, 2006 email is read in light of BIRGITTA's contention that CAPITAL BANK had already consented to BIRGITTA's removal from "UK territorial waters" when it added the word "EUROPE" to the Marine Mortgage, that April 27, 2006 email certainly supports resolving the BANK-created ambiguity in BIRGITTA's favor. As discussed more fully below, it was only after CAPITAL BANK hatched a scheme to trump up default allegations against JUANITA later in April 2005 because of some unrelated adverse publicity involving JUANITA director Carl Freer, that CAPITAL BANK

invented the alleged UK waters/lack of consent default.

Again, while JUANITA contends the above-referenced evidence clearly and completely refutes CAPITAL BANK's allegation of default on the "UK territorial waters" issue, at a minimum it is unquestionably sufficient to raise a triable issue of fact on that issue.

### IV. UNDER THE DOCTRINE OF UNCLEAN HANDS, NO ALLEGED POST-ARREST DEFAULT IS ACTIONABLE, INCLUDING THE CHANGE OF OWNERSHIP OF JUANITA

Based on the forgoing referenced evidence, there are clearly facts to support the conclusion that when CAPITAL BANK arrested the BIRGITTA in May 2006 and September 2008 there had been no pre-May 2006 payment or insurance defaults and CAPITAL BANK had consented to JUANITA operating the BIRGITTA outside of UK territorial waters. Consequently, BIRGITTA contends the May 2006 and September 2008 arrests were wrongful. If that contention prevails then BIRGITTA further contends that under the doctrine of unclean hands CAPITAL BANK cannot prevail on its claims for any post-arrest defaults, including the change of ownership grounds as alleged in its pending motion.

The true reasons CAPITAL BANK arrested the BIRGITTA in May 2006 were: (a) to pressure Carl Freer, one of JUANITA's directors, into honoring his personal guarantee related to the financing of three high-value automobiles; and, (b) the notion that Carl Freer was not the "kind of customer" that CAPITAL BANK wanted, because of bad publicity he received from false press reports of his arrest on charges (subsequently dismissed) having nothing whatever to do with BIRGITTA or the subject mortgage. [AMF 90]

The doctrine of unclean hands bars a wrongdoer from profiting from his own unjust conduct. As the Ninth Circuit noted in *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985):

/ / /

"This maxim 'closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.' [Citation omitted]  In applying the doctrine, '[w]hat is material is not that the plaintiff's hands are dirty, *but that he dirtied them in acquiring the right he now asserts*, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants.'" (Citation omitted) (Emphasis added)

Here, as demonstrated in considerable detail above, there were *no* pre-arrest defaults under the subject ship mortgage.  In claiming its First Amended Complaint was necessary to "shore up" the allegations of its initial Complaint (the pleading upon which the arrest was premised) [Document No. 1] CAPITAL BANK came as close as any plaintiff is ever likely to come to admitting its pre-arrest allegations were spurious.  Having proceeded on the basis of false allegations, inaccurate documents affixed to and incorporated in its pleadings, and having wrongfully deprived JUANITA of its property as a means to extract some unrelated concessions from Mr. Freer, CAPITAL BANK cannot be heard to complain that, after unjustifiably putting JUANITA in such *extremis*, JUANITA is now chargeable with *post*-arrest defaults.  That would merely reward CAPITAL BANK for its dirty hands, not punish it.  Any such post-arrest "defaults" are the direct consequence of the unjustified arrest - the very means by which CAPITAL BANK "aquir[ed] the right [it] now asserts".  *Ellenburg, supra.*

DATED: June 18, 2010

                                **COPPENRATH & ASSOCIATES, LLP**

                                /S/ WALTER G. COPPENRATH, JR.

By: _____
Walter G. Coppenrath, Jr.
Attorneys for Specially Appearing
Claimant and Defendant
JUANITA GROUP LIMITED and
Defendant M/Y BIRGITTA